# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

JAN 3 0 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

| | |
|---|---|
| **PHILLIP W. SMITH,** ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:07cv00045 |
| ) | |
| **v.** ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

## I. Background and Standard of Review

The plaintiff, Phillip W. Smith, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Smith's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith filed his application for DIB on or about May 23, 2005,[1] alleging disability as of December 1, 2004, due to sleep apnea, inability to stay awake or concentrate, lack of energy, high blood pressure, anxiety and panic attacks. (Record, ("R."), at 11, 15, 44, 188.) The claim was denied initially and upon reconsideration. (R. at 21-22, 26-30.) Smith then requested a hearing before an administrative law judge, ("ALJ"). (R. at 31-32.) A hearing was held before the ALJ on November 2, 2006, at which Smith was represented by counsel. (R. at 182-201.)

By decision dated December 14, 2006, the ALJ denied Smith's claim. (R. at 8-19.) The ALJ found that Smith met the disability insured status requirements of the Act for disability purposes through December 31, 2008. (R. at 13.) The ALJ determined that Smith had not engaged in substantial gainful activity since the alleged onset date. (R. at 13.) The ALJ also found that Smith suffered from the following impairments, which, in combination, qualified as "severe," namely

---

[1] The record references two possible dates that Smith may have filed his application for DIB. In the ALJ's opinion, he stated that Smith filed the application on May 23, 2005, (R. at 11); however, within the hearing transcript, the ALJ stated that Smith filed his application on May 31, 2005. (R. at 186.) For purposes of this opinion, the court will use the date stated in the ALJ's opinion.

Case 1:07-cv-00045-GMW-PMS    Document 16    Filed 01/30/08    Page 2 of 40    Pageid#: 257

tachycardia, hypertension, venous insufficiency, chronic obstructive pulmonary disease, dorsal kyphosis and degenerative joint disease. (R. at 13.) The ALJ determined that Smith's complaints of sleep apnea syndrome were not severe, as there was no evidence presented that indicated that the condition results in more than minimal limitations in functioning. (R. at 13.) Likewise, the ALJ found that Smith's complaints of anxiety and depression were not severe as defined by the Social Security regulations. (R. at 14.) Although the ALJ identified several impairments as severe limitations, he determined that Smith did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.)

The ALJ also found that Smith possessed the residual functional capacity to perform work with the following limitations: the ability to lift and carry items weighing up to 50 pounds occasionally and items weighing up to 25 pounds frequently; stand and/or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; frequently balance, crouch, crawl and stoop; occasionally climb and kneel; occasionally reach in all directions, including overhead; limited exposure to noise, dust, vibration, fumes, odors, chemicals and gases; and no fine hearing ability. (R. at 15.) The ALJ found that a restriction of only occasional reaching equated to a moderate limitation. (R. at 15.) Thus, the ALJ determined that Smith was unable to perform any of his past relevant work. (R. at 18.) The ALJ found that the transferability of job skills was not material to the determination of disability. (R. at 18.) Based upon Smith's age, education, work experience and residual functional capacity, the ALJ concluded that Smith could perform jobs existing in significant numbers in the national economy, including

-3-

those of a hand packager, a sorter, an assembler, an inspector, a cleaner and as a food service-related employee. (R. at 19.) Therefore, the ALJ found that Smith was not under a "disability" as defined under the Act and, thus, was not entitled to benefits. (R. at 19.) *See* 20 C.F.R. § 404.1520(g).

After the ALJ issued his decision, Smith pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 6.) The Appeals Council denied Smith's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 3-5.) Thereafter, Smith filed this action seeking review of the ALJ's unfavorable decision. This case is currently before the court on Smith's motion for summary judgment, (Docket Item No. 10), filed September 27, 2007, and on the Commissioner's motion for summary judgment, (Docket Item No. 14), filed November 26, 2007.

## II. Facts

Smith was born in 1950, which classifies him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). (R. at 38, 186.) According to the record, Smith has a "high school education" pursuant to 20 C.F.R. § 404.1564(b)(4). (R. at 18, 48, 187.) In addition, Smith has past relevant work experience as a tablet batch mixer. (R. at 18, 44-45, 187.)

At Smith's hearing before the ALJ on November 2, 2006, he testified that he was a high school graduate and that he completed nearly two years of college. (R. at 187.) Smith explained that he was not employed at the time of the hearing and that

Case 1:07-cv-00045-GMW-PMS   Document 16   Filed 01/30/08   Page 4 of 40   Pageid#: 259

he was last employed as a batch mixer and tablet technician. (R. at 187.) He further explained that his past employment required that he repair and clean the tablet machines, which required frequent standing. (R. at 188.) Smith noted that lifting and carrying certain items was associated with this particular job, and that he was required to lift approximately 50 pounds. (R. at 188.) Smith estimated that he worked approximately 21 years as a batch mixer and tablet technician. (R. at 188.)

Smith was asked to identify any problems experienced since his alleged onset of disability that prevented him from working. (R. at 188.) Smith testified that he suffered from sleep apnea and depression, and indicated that he was currently taking Zoloft and Risperdal to treat his problems. (R. at 188.) He indicated that he had been taking these prescription medications since approximately 2001. (R. at 188.) Additionally, Smith testified that "I have panic attacks and I just, I think I hate everybody and everything, but I don't mean to be like that." (R. at 188.) Smith explained that he has trouble sleeping, which requires him to use a continuous positive airway pressure, ("CPAP"), machine. (R. at 189.) He testified that he had not experienced problems with the CPAP machine, but claimed that, despite use of the machine to treat his sleep apnea, he "stay[ed] tired all the time." (R. at 189.) Smith's counsel asked if he had to rest or lie down throughout the day, to which Smith responded, "[m]ost of the time I just, I lay on the couch, or stay in the bed." (R. at 189.) Smith further testified that his energy level was not good. (R. at 189.)

Smith noted that he suffered from nerve problems and referred to a panic attack that occurred in approximately 1998 or 1999. (R. at 189.) He explained that, at that time, he thought he was having a heart attack, which required that he be placed in the

-5-

hospital. (R. at 189.) Smith stated that the panic attacks continued, causing him to present to the emergency room on one occasion. (R. at 189.) After these incidents, Smith was prescribed Zoloft 200 milligrams, ("mg"). (R. at 189.) Smith commented that he was prescribed Zoloft while he was still employed. (R. at 189.) When asked about his current nerve condition, Smith remarked that his nerves were "probably worse." (R. at 190.) Smith explained that he felt his condition was worse because he "used to be a nice guy" and now he "hate[s] everybody and everything." (R. at 190.) In addition, he testified that he has trouble getting along with his friends and/or family. (R. at 190.) Smith specifically referenced getting upset with his wife, which causes him to feel "like [his] insides are shaking[, making him] real irritable." (R. at 190.) Smith indicated that he gets discouraged and experiences feelings of uselessness. (R. at 190.) He testified that he has no desire to socialize with friends and family. (R. at 190.) Smith also claimed that he no longer has as many interests as he once did, and that he has problems with focus, memory and concentration. (R. at 191.)

Smith testified that he currently receives treatment for depression and anxiety. (R. at 191.) He further testified that he receives treatment monthly, or about every two or three weeks. (R. at 192.) Smith noted that the treatment helps him cope with his problems and allows him to "talk out" his problems so that he does not get "so angry." (R. at 192.) Smith also indicated that he has experienced problems with his legs and arms, including consistent muscle and leg twitching, as well as joint pain. (R. at 192.) In addition, Smith claimed that he had grip problems and that he was unable to hold heavy objects for extended periods. (R. at 192.)

-6-

Smith estimated that he spends approximately four to six hours per day resting or lying down, due to tiredness and lack of energy. (R. at 192-93.) He explained that he typically goes to bed at 12:00 a.m. or 1:00 a.m., and that sometimes he awakes a approximately 4:00 a.m., and that other times he may sleep until 9:00 a.m. or 10:00 a.m. (R. at 193.) In describing his daily activities, Smith testified that he watches television, spends time on the computer and lies on the couch. (R. at 193.) Smith noted that he plays games on the computer, but can only engage in the games for approximately 30 to 45 minutes. (R. at 193.) He also indicated that, in a typical day, he may walk to the mailbox to retrieve the mail and paper. (R. at 193.) Smith testified that he does drive, but explained that he has recently experienced problems driving due to poor balance. (R. at 193.) Smith stated that he often finds himself checking to see if the iron or coffee pot is unplugged, and that he repeatedly checks to see if the door is locked. (R. at 194.) He claimed that he engages in these type of activities "every day or every other day." (R. at 194.) Smith testified that he still experiences panic attacks two to four times per month. (R. at 194.) He further explained that the panic attacks are "not major ones, but . . . I just get all upset and everything." (R. at 194.) Smith testified that the panic attacks usually last 30 minutes to an hour. (R. at 194.)

Donna J. Bardsley, a vocational expert, also testified at Smith's hearing. (R. at 195-200.) Bardsley identified Smith's past relevant work as a batch mixer and tablet technician as medium,[2] semi-skilled work. (R. at 196.) Bardsley testified that

---

[2] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

-7-

Smith had no transferable skills. (R. at 196.) The ALJ then asked Bardsley to consider a hypothetical claimant of the same age, education and past work experience as Smith. (R. at 196.) In addition, the ALJ asked Bardsley to assume that the hypothetical claimant had the exertional limitations as set forth in Exhibit 7F,[3] i.e. the ability to occasionally lift and/or carry items weighing up to 50 pounds; the ability to frequently lift and/or carry items weighing up to 25 pounds; the ability to stand and /or walk for about six hours in an eight-hour workday; the ability to sit for about six hours in an eight-hour workday; and no limitations in the ability to push and/or pull. (R. at 197.) The ALJ asked Bardsley what, if any, job category an individual with these limitations would fall into and if there were any jobs in the regional and national economies that this hypothetical individual could perform. (R. at 197.) Bardsley noted that, based upon Exhibit 7F, this hypothetical individual was limited in his ability to reach in all directions, but noted that she was uncertain as to how to interpret such a limitation in relation to the type of the work the individual could perform. (R. at 197.) However, she did state that the lifting capabilities would qualify as medium work. (R. at 197.) The ALJ then asked what work the individual could perform if the individual had moderate limitations in his reaching ability. (R. at 197.) Bardsley testified "as long as . . . the person could reach out in front of them and lift that weight, there would still be jobs [in the regional and national economies]." (R. at 197.) Bardsley opined that a person with the above-mentioned restrictions could perform jobs such as a hand packager, a sorter, an assembler, an inspector, a cleaner and occupations in the food services industry. (R. at 197-98.) Bardsley also acknowledged that if the individual had severe limitations that would

---

[3] Exhibit 7F contains the findings of a consultative examination conducted by Dr. William Humphries, M.D. (R. at 143-50.)

-8-

not permit them to reach out in front of them and lift the required weight, then no jobs would be available. (R. at 197.)

The ALJ then posed a second hypothetical to Bardsley, asking her to assume all the facts from the first hypothetical, but to also assume that the hypothetical individual possessed the non-exertional limitations set for in Exhibit 8F. (R. at 198.) Based upon Exhibit 8F,[4] the hypothetical individual's ability to understand, remember and carry out instructions was found to be unaffected by the impairment; however, the individual's ability to respond appropriately to supervision, co-workers and work pressure was found to be affected by the impairment, with slight restrictions in the ability to interact with supervisors and co-workers, slight restrictions in the ability to respond appropriately to work pressures and changes in a routine work setting and no restrictions in the ability to interact appropriately with the public. (R. at 156-57.) Bardsley testified that the consideration of Exhibit 8F did not impact her opinions as to the jobs identified in the first hypothetical. (R. at 198.)

The ALJ posed a third hypothetical, asking Bardsley to assume all the facts present in the first hypothetical and the jobs identified, and, in addition, he asked that she assume that the hypothetical individual had the non-exertional limitations as set forth in Exhibit 6F.[5] (R. at 198.) Based upon Exhibit 6F, the individual would possess a fair ability to follow work rules, relate to co-workers, deal with the public,

---

[4] Exhibit 8F contains the findings of an evaluation conducted by Edward E. Latham, Ph.D. (R. at 151-58.)

[5] Exhibit 6F contains the findings of a psychological evaluation conducted by Robert C. Miller, Ed.D. (R. at 136-42.)

-9-

use judgment with the public, interact with supervisors, function independently and maintain attention/concentration and a poor or no ability to deal with work stresses. (R. at 140.) Moreover, the individual would have good ability to understand, remember and carry out simple job instructions, a fair ability to understand, remember and carry out detailed, but not complex, job instructions and a poor or no ability to understand remember and carry out complex job instructions. (R. at 141.) Bardsley opined that an individual with these restrictions would be unable to perform any jobs. (R. at 198.)

In a fourth hypothetical, the ALJ again asked Bardsley to assume all the facts present in the first hypothetical and the jobs identified, in conjunction with the non-exertional limitations set forth in Exhibit 10F.[6] (R. at 199.) According to Exhibit 10F, the hypothetical individual possessed a fair ability to follow work rules and relate to co-workers, but only a fair to poor ability to deal with the public, use judgment with public, interact with supervisors and function independently, and a poor ability to deal with work stresses and maintain attention/concentration. (R. at 179.) The hypothetical individual would also have a fair to poor ability to understand, remember and carry out simple job instructions, as well as a poor ability to understand, remember and carry out complex and detailed job instructions. (R. at 179.) Furthermore, the individual would have a good ability to maintain personal appearance, a fair to poor ability to behave in an emotionally stable manner and a poor ability to relate predictably in social situations. (R. at 180.) Based upon these

---

[6] Exhibit 10F contains a Medical Assessment of Ability to do Work-Related Activities (Mental) form completed by Deborah Patterson, Licensed Clinical Social Worker, and Licencsed Counseling Professional. (R. at 179-81.)

restrictions, Bardsley testified that this individual would be unable to perform any jobs. (R. at 199.)

In his final hypothetical, the ALJ asked Bardsley to assume a hypothetical individual with the same age, education and past relevant work experience as Smith, and he asked that Bardsley apply Smith's testimony to the hypothetical individual, with the assumption that the individual is credible and reliable. (R. at 199.) Relying on the previously mentioned assumptions, the ALJ asked Bardsley if there were any jobs within the regional or national economies that the individual could perform. (R. at 199.) Bardsley opined that the individual could not perform any jobs based upon those assumptions. (R. at 199.)

At the conclusion of the ALJ's questioning, Smith's counsel asked Bardsley if the number of identified jobs would be altered if the hypothetical individual was limited in his ability to reach in all directions and to climb and kneel, at most, a third of a typical eight-hour workday and not on a continuous basis. (R. at 200.) Bardsley indicated that none of the jobs would be available because she would consider those restrictions to be greater than moderate. (R. at 200.) In addition, Smith's counsel asked if restrictions regarding the individual's exposure to noise, dust, vibrations, fumes, odors and chemicals would impact the identified jobs. (R. at 200.) Bardsley testified that the number of jobs would be lower by occupational job base by at least 50 percent. (R. at 200.)

In rendering his decision, the ALJ reviewed records from Mendota Medical Center, ("MMC"); Bristol Regional Medical Center, ("BRMC"); Dr. David Cowden,

Case 1:07-cv-00045-GMW-PMS    Document 16    Filed 01/30/08    Page 11 of 40    Pageid#: 266

M.D.; Dr. Claude Crockett, M.D.; Disability Determination Services, ("DDS"); Dr. F. Joseph Duckwall, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Robert Miller, Ed.D; Dr. William Humphries, M.D.; Edward Latham, Ph.D; Dr. Ashvin Patel, M.D.; and Deborah Patterson, Licensed Clinical Social Worker, ("LCSW"), and Licensed Professional Counsel, ("LPC").

Smith sought treatment from MMC from January 19, 2000, to November 2, 2005. (R. at 72-124.) Smith completed a medical history form during an office visit to MMC on January 19, 2000. (R. at 106-07.) The form indicated that Smith suffered from sinus problems, hearing loss, left shoulder pain and that he took medication to treat high blood pressure. (R. at 106.) Smith reported hobbies such as bowling, golf, fishing and hunting. (R. at 107.) Smith presented to MMC complaining of left shoulder pain. (R. at 105.) Smith indicated that the shoulder became worse after bowling, but he denied any known injury to the shoulder. (R. at 105.) He explained that the pain radiated from his shoulder down into his upper and lower arm. (R. at 105.) Upon physical examination, Smith was found to be in no acute distress, but a slightly elevated blood pressure was noted. (R. at 105.) Redness was observed around the shoulder and Smith complained of pain upon movement of the shoulder. (R. at 105.) Tenderness also was found in and around the left shoulder joint. (R. at 105.) However, full range of motion of the shoulder was reported. (R. at 105.) Smith's radial pulses were 2+ and his grips were strong and equal bilaterally. (R. at 105.) It was determined that the left shoulder pain was due to probable bursitis tendonitis. (R. at 105.) Smith was prescribed Relafen and was instructed to return to the clinic if his symptoms did not improve. (R. at 105.)

-12-

Smith again presented to MMC on December 19, 2000, complaining of sinus congestion, coughing and wheezing. (R. at 104.) Additionally, Smith complained of low back pain and reported a history of low back pain. (R. at 104.) He attributed the aggravation of the back pain to lifting furniture and noted that he took Advil to treat the pain. (R. at 104.) Upon physical examination, a slightly elevated blood pressure was reported, but he was again found to be in no acute distress. (R. at 104.) He walked with difficulty due to his low back injury. (R. at 104.) Tenderness was reported in Smith's frontal maxillary sinuses and his throat was very erythematous, with postnasal drip. (R. at 104.) A chest examination revealed wheezing, especially in the left upper lobe. (R. at 104.) Smith had difficulty getting up and down from the examining table and his range of motion was decreased. (R. at 104.) Smith was diagnosed with sinusitis/bronchitis and low back pain related to a strain. (R. at 104.) Smith was prescribed Augmentin, Allegra, Bidex, Ultram and Arthrotec, as well as a Combivent inhaler. (R. at 104.) Smith was instructed to treat his back with warm, moist heat or ice and also was instructed to take the remainder of the week off from work. (R. at 104.) Moreover, the was told to return to the clinic for treatment if his symptoms did not improve. (R. at 104.)

On January 5, 2001, Smith returned to MMC for a follow-up appointment related to his lower back pain and sinusitis/bronchitis. (R. at 103.) Smith indicated that he felt better and that his back pain was resolved. (R. at 103.) Also, Smith stated that his sinusitis/bronchitis had improved. (R. at 103.) A physical exam showed no acute distress. (R. at 103.) Smith reportedly had significant nasal congestion and postnasal drip. (R. at 103.) He indicated that he was unable to take the Allegra as prescribed because it increased his heart beat. (R. at 103.) Smith's chest was clear

-13-

and his heart rate and rhythm were regular. (R. at 103.) Smith was given Claritin and was instructed to continue taking Bidex and Flonase. (R. at 103.) Moreover, Smith's blood pressure medication, Vasotec, was increased to 20 mg per day. (R. at 103.) The assessment revealed hypertension, sinusitis/bronchitis and low back pain. (R. at 103.)

On January 8, 2001, Smith presented for a chest x-ray at BRMC that showed a linear density in the left base, consistent with scarring, which was consistent with a previous exam. (R. at 118.) The x-ray also found evidence of what appeared to be a granuloma in the right base and several deformed right lateral ribs, which suggested old trauma. (R. at 118.) Heart and pulmonary vascularity was found to be unremarkable and no infiltrates or pleural fluid was noted. (R. at 118.) The x-ray determined that Smith did not suffer from acute cardiopulmonary disease. (R. at 118.) Smith presented to MMC again on January 24, 2001, for flu treatment. (R. at 102.) He explained that his blood pressure was okay, but reported continued anxiety problems. (R. at 102.) The medical records indicate that, as of this January 2001 visit, he was taking Valium 5 mg three times per day. (R. at 102.) Smith acknowledged that the Valium helped treat his nerve problems. (R. at 102.) Smith indicated that he felt secure when taking the medication, but without it, he claimed that he experienced anxiety attacks, nervousness and a flushed feeling. (R. at 102.) Smith was prescribed Paxil and hydroxyzine to treat his anxiety and the Valium was discontinued. (R. at 102.) In addition, Smith was instructed to monitor his blood pressure and increase his exercising. (R. at 102.)

On February 13, 2001, Smith presented with sinus problems and indicated that

-14-

he had not felt well since his last office visit. (R. at 101.) Smith was in no acute distress and his blood pressure was improved, due to the increase in his Vasotec dosage. (R. at 101.) He was tender in his frontal maxillary sinuses and his throat was slightly erythematous with blisters. (R. at 101.) Smith's chest was clear and he had a regular heart rate and rhythm. (R. at 101.) Smith was prescribed Z-Pak, Duratuss HD, pseudoephedrine and Zyrtec to treat his sinusitis. (R. at 101.) He also was told to continue the use of Flonase and saline nasal spray. (R. at 101.) Smith presented on June 19, 2001, with similar complaints. (R. at 100.) The assessment noted bronchitis and allergic rhinitis, and he was instructed to continue a similar treatment regimen. (R. at 100.) Laboratory reports dated June 21, 2001, and April 14, 2004, revealed a low glucose and red blood cell count, and high levels of trigylcerides and cholesterol. (R. at 122-23.)

On September 17, 2001, Smith presented to MMC with similar sinus complaints, but also reported nausea, headaches and some vertigo. (R. at 99.) Upon examination, Smith was reported to be in no acute distress, but did have an elevated blood pressure. (R. at 99.) Nasal congestion and postnasal drip were noted, and his throat was erythematous. (R. at 99.) Smith also had tenderness in his frontal maxillary sinuses. (R. at 99.) Smith requested that he be taken off Paxil and prescribed another anti-depressant because the Paxil allegedly caused unpleasant sexual side effects. (R. at 99.) The assessment reported vertigo or probable labyrinthitis, sinusitis and hypertension, which was uncontrolled by Vasotec. (R. at 99.) Smith's Paxil prescription was discontinued and he was prescribed Zoloft 50 mg. (R. at 99.) Smith also sought treatment on September 20, 2001, and complained of sinusitis. (R. at 98.) He claimed that his sinuses were getting worse and that he

-15-

had experienced bilateral ear pain and face and teeth pain. (R. at 98.) Smith's blood pressure was once again elevated. (R. at 98.) His frontal maxillary sinuses were tender and his throat was erythematous with postnasal drip. (R. at 98.) In addition, some cervical lymph node enlargement was recognized. (R. at 98.) Smith was essentially given the same treatment regimen. (R. at 98.) He presented for follow-up appointments on September 24, 2001, and October 1, 2001, and indicated that he felt better. (R. at 96-97.) Overall, his treatment remained the same; however, he was prescribed Antivert 25 mg to take three times per day for dizziness. (R. at 96.) On September 27, 2001, a chest x-ray at BRMC found the cardiac size to be normal and also revealed clear lungs with no pulmonary consolidations or pleural effusions. (R. at 121.) There was no evidence of active cardiopulmonary disease. (R. at 121.)

On October 10, 2001, Smith presented to MMC and complained of dizziness, blurred vision and sinus headaches. (R. at 95.) He explained that the dizziness seemed to be worse immediately after lying down or standing up. (R. at 95.) Smith stated that, while at work, he experienced severe dizziness and had to be taken away in a wheelchair. (R. at 95.) Prior to this experience, he stated that it had been approximately two years since he last experienced that type of episode. (R. at 95.) He indicated that he had experienced similar episodes over the past 20 to 30 years. (R. at 95.) In the assessment, continued positional vertigo was noted, with possible residual labyrinthitis. (R. at 95.) Smith was given refills on his medications as well. (R. at 95.) On October 18, 2001, Smith presented with complaints of facial swelling. (R. at 94.) His complaints and the findings remained the same, with the exception of cellulitis under the left eye, which was attributed to chronic sinusitis. (R. at 94.) Smith was prescribed Levaquin 500 mg to take four times per day. (R. at 94.) Smith

-16-

was advised to continue with his nasal spray and was started on a steroid dose pack. (R. at 94.) He also was referred for a CT of the paranasal sinuses and was instructed to continue applying warm compresses on his face. (R. at 94.)

On October 18, 2001, a computerized axial tomography, ("CT"), of the sinuses was conducted at BRMC and found the dominant sphenoid sinus to be well aerated, with the small sphenoid air cell on the right containing a mucosal rentention cyst and/or mucoperiosteal thickening. (R. at 120.) The CT also found the left frontal sinus to be well aerated and observed a small amount of mucoperiosteal thickening of the right frontal sinus. (R. at 120.) The maxillary sinuses demonstrated a minimal peripheral mucoperiosteal thickening involving multiple ethmoid sinuses bilaterally. (R. at 120.) In addition, concha bullosa of the middle was found to turbinate bilaterally with mucoperiosteal thickening and/or fluid filling the right side. (R. at 120.) A minimal nasal septal deviation was noted, and the region of the ostiomeatal complexes appeared occluded bilaterally. (R. at 120.)

On October 24, 2001, Smith appeared for a follow-up appointment related to his sinusitis and labyrinthitis. (R. at 93.) Upon examination, Smith was again tender in his frontal maxillary sinuses and nasal congestion and postnasal drip was reported. (R. at 93.) Smith also continued to wheeze, which was attributed to bronchitis. (R. at 93.) He was instructed to continue with his medications and was kept off work for an additional week due to the fact that he worked around machinery. (R. at 93.) Smith presented for another follow-up appointment on October 30, 2001, and the records show that his illness caused him to remain out of work for several weeks. (R. at 92.) Smith reported that he was feeling better, but he continued to have problems

-17-

with his labyrinthitis. (R. at 92.) Smith felt that he could not work around machinery as required by his job. (R. at 92.) His blood pressure was slightly elevated. (R. at 92.) Furthermore, the assessment noted chronic sinusitis and hypertension. (R. at 92.) Smith was advised to finish the medications given to treat the sinusitis and his hydrochlorothiazide dosage was increased to 50 mg per day and his Vasotec prescription was increased to 40 mg per day. (R. at 92.)

Another CT of the sinuses was taken on November 5, 2001, and was compared to the previous examination. (R. at 119.) A slight shift in the pattern of mucosal thickening was observed through the sinuses, with some improvement in the maxillary regions and worsening in the right frontal region. (R. at 119.) No significant change was noted in the mucosal thickening of the ethmoid sinuses. (R. at 119.) On November 9, 2001, Smith presented for a follow-up appointment regarding his chronic sinusitis. (R. at 91.) At this visit, the results of the November 5, 2001, CT scan were reviewed. (R. at 91.) His sinus pressure with nasal congestion continued and wheezing was noted through the chest area. (R. at 91.) Smith's blood pressure was "much improved" during this visit. (R. at 91.) Smith's assessment again noted chronic sinusitis and bronchitis. (R. at 91.) He was encouraged to stop smoking and was given an Advair Diskus to use twice a day. (R. at 91.) Smith was also instructed to continue his Combivent and nasal sprays. (R. at 91.)

On November 30, 2001, Smith returned to MMC. (R. at 90.) The medical records indicate that Smith was referred to an ear, nose and throat specialist in Kingsport, Tennessee. (R. at 90.) Smith reported continued problems with labyrinthitis and explained that he remained unable to return to work. (R. at 90.) He

-18-

also claimed that he continued to experience dizziness and vertigo at times, which caused him to fear returning to work. (R. at 90.) He was instructed to schedule a follow-up appointment after obtaining another CT scan. (R. at 90.) At the December 29, 2001, follow-up appointment, Smith reported similar symptoms and also complained of low back pain. (R. at 89.) He was told to continue his Combivent, Arthrotec and Ultram, and also was prescribed Z-Pak, Pred Pak 5 mg and advised to start doing back exercises. (R. at 89.) The record shows that Smith was offered physical therapy, but Smith felt he could manage without the treatment. (R. at 89.) In addition, it was noted that if Smith's blood pressure remained elevated, an increase in his medication would be warranted. (R. at 89.)

A letter dated February 4, 2002, was sent to MMC from Marilyn Conston, the nurse case manager for Smith's employer. (R. at 88.) Conston referenced Smith's episodes of dizziness and explained that she was concerned for his safety because his job, on occasion, required that he work on ladders. (R. at 88.) She also explained that Smith had voiced concerns about the possible need for a surgical procedure that he viewed as too risky. (R. at 88.) In order to get a better understanding of Smith's situation, Conston scheduled an independent medical evaluation for Smith with Dr. Claude Crockett, M.D., which occurred on January 28, 2002.[7] (R. at 88.) Once the evaluation was completed, Conston forwarded the findings to MMC. (R. at 88.)

On February 6, 2002, Smith presented to MMC for a follow-up appointment related to his chronic sinusitis. (R. at 87.) The report noted that Smith had been referred to Dr. David Cowden, M.D., in Kingsport, Tennessee. (R. at 87.) In

---

[7] Dr. Crockett's findings will be discussed in detail later in this section.

addition, the independent medical evaluation by Dr. Crockett was referenced, in which Dr. Crockett found no evidence of sinusitis or labyrinthitis. (R. at 87.) Upon examination, Smith's blood pressure was again elevated. (R. at 87.) Smith also sought treatment at MMC on June 3, 2002, and due to his blood pressure, he was prescribed Norvasc five mg to take three times per day. (R. at 87.)

Smith continued with periodic office visits from August 1, 2002, to November 4, 2004. (R. at 72-86.) At the majority of these visits, Smith's symptoms and treatment remained the same. (R. at 72-86.) He was repeatedly instructed to monitor his blood pressure and was advised to continue with his medications. (R. at 72-86.) On December 22, 2003, Smith also complained of fatigue, fever and chills, in addition to his usual complaints of nasal congestion and coughing. (R. at 77.) On October 6, 2004, Smith presented and complained of left shoulder and arm pain. (R. at 74.) He reported tingling and numbness in the left arm and hand, but noted no muscle weakness or rotator cuff problems. (R. at 74.) Smith was assessed with ulnar nerve trauma and was encouraged to rest his left arm. (R. at 74.) Throughout these office visits, Smith was also encouraged to stop smoking and to lose weight. (R. at 74.) On November 4, 2004, Smith presented to MMC with complaints of sleep apnea and for a follow-up regarding a hernia. (R. at 73.) At that time, he indicated that the hernia did not bother him. (R. at 73.) Smith's blood pressure was again reported as uncontrolled; thus, his Norvasc dosage was increased. (R. at 73.) Due to his sleep complaints, Smith was referred for a sleep study. (R. at 73.)

On December 4, 2004, Smith presented to BRMC's Sleep Disorders Center. (R. at 113-17.) Smith underwent a first night sleep study to rule out obstructive sleep

-20-

apnea, ("OSA"). (R. at 113.) Smith was observed to have obstructive apneas and hypopneas with arousals. (R. at 113.) Mild to loud snoring was noted, however, no arrhythmias were reported. (R. at 113.) The study found that Smith did not meet the criteria for a first night split study due to the inability to sleep until later in the night. (R. at 113.) Shortly thereafter, on January 15, 2005, Smith again underwent a sleep disorder study. (R. at 108-12.) This particular study was a second night study, and the records indicate that Smith was diagnosed with severe sleep apnea syndrome following the December 2004 test. (R. at 108.) A formal polysomnogram with CPAP titration was carried out, and Smith reportedly slept for 89.5% of the examination. (R. at 108.) Smith was diagnosed with severe sleep apnea syndrome, but the clinical impression noted that the "[s]yndrome [was] corrected with 12 cm of continuous positive airway pressure with warm humidity via a Respironics Comfort Gel mask." (R. at 108.) The medical records also noted that Smith needed to lose weight. (R. at 108.)

As noted above, Smith was referred to Dr. David Cowden, M.D., of Ear, Nose & Throat Associates of Kingsport, P.C. (R. at 125-29.) On November 19, 2001, Smith presented to Dr. Cowden. (R. at 127.) Upon examination, Dr. Cowden reported mostly normal findings, but noted that Smith's nasal septum was deviated to the right. (R. at 127.) Dr. Cowden determined that Smith likely suffered from chronic sinustitis and prescribed Augmentin for one month. (R. at 127.) He also ordered an x-ray and explained that treatment would proceed thereafter. (R. at 127.) After the examination, Dr. Cowden contacted MMC and attributed a good portion of Smith's problems to allergic rhinitis with a super-imposed sinus disease. (R. at 126.) Dr. Cowden ordered a CT of the paranasal sinuses, which was performed on January

3, 2002. (R. at 129.) The scan found changes of chronic sinusitis involving the ethmoidal air cells bilaterally as well as both maxillary antra and minimally a the right frontal sinus. (R. at 129.) The changes as to the maxillary antra appeared to be minimally worsened when compared to the November 5, 2001, scan. (R. at 129.) The scan showed the severity of Smith's sinusitis to be no more than mild to moderate. (R. at 129.) Dr. Cowden reviewed the CT scan and noted that he was "not impressed with the swelling but [Smith] does have rather prominent concha bullosa bilaterally and this may be a factor." (R. at 125.) Dr. Cowden concluded that Smith suffered from minimal sinus disease with concha bullosa and nasal symptoms. (R. at 125.) He discussed the possibility of sinus surgery with Smith and explained the potential eye and brain complications that could arise if he chose to proceed with surgery. (R. at 125.)

As referenced above, Smith's employer's scheduled an independent medical evaluation, which was performed by Dr. Claude Crockett on January 28, 2002. (R. at 131.) A physical examination was unremarkable with no abnormalities, except for the notation that Smith had a significant nasal septal deflection. (R. at 131.) Dr. Crockett ordered an audiogram, which revealed a normal showing with no indications of hydrops. (R. at 131.) After reviewing Smith's CT scan, Dr. Crockett noted that, except for a small amount of thickening on the medial wall of the maxillary sinuses and a concha bullosa and the slight septal deflection, the CT scan was completely normal. (R. at 131.) Dr. Crockett concluded "unequivocally" that there was "no sign of any chronic sinusitis." (R. at 131.) He further opined that there was no evidence of chronic sinusitis or inner ear trouble that would prevent Smith from performing his normal job. (R. at 131.) Specifically, he found that Smith's medical condition did

-22-

not preclude travel to and from work; did not preclude him from being at work; did not preclude assignment of the tasks and duties outlined in his job description; did not adversely affect his life activities, such as driving, shopping, self-care and recreation; and that there was no reason to believe he is likely to experience injury by performing his job tasks. (R. at 130.)

On October 25, 2005, Dr. Frank M. Johnson, M.D., a state agency physician, found that Smith's medical condition was not severe. (R. at 133-34.) Dr. Johnson noted that Smith complained of sleep apnea with fatigue. (R. at 134.) He also observed that the record shows that Smith shops, drives and mows with a riding mower, but sometimes needs to rest when completing these chores. (R. at 134.) Dr. Johnson remarked that Smith had no problem with personal care, and that he participated in bowling two times per week. (R. at 134.) After reviewing the medical records, Dr. Johnson pointed out that Smith's sleep apnea was corrected with 12 cm of continuous positive airway pressure. (R. at 134.) Dr. Johnson opined that Smith's allegations were only partially credible and concluded that his condition was not severe. (R. at 134.) On February 6, 2005, Dr. F. Joseph Duckwall agreed with Dr. Johnson's findings. (R. at 135.)

On May 31, 2006, Robert C. Miller, Ed.D, performed a psychological evaluation at the request of Smith's counsel. (R. at 136-42.) Miller administered several examinations, including the Minnesota Multiphasic Personality Inventory - 2, ("MMPI-2"), the Miller Forensic Assessment of Symptoms Test, ("MFAST"), the MINI Patient Health Survey and a clinical interview and mental health exam. (R. at 136-42.) During this evaluation, Miller noted that Smith acknowledged that his

-23-

medications helped his sleeping problems. (R. at 136.) Smith reported no difficulties in driving, and he arrived at the examination unaccompanied. (R. at 137.) Miller observed his motor behavior as mildly restless, but stated that his level of responsiveness was vigilant and attentive. (R. at 137.) Miller saw no signs of distress during the examination. (R. at 137.) Although Smith was cooperative, Miller reported that Smith's facial expression was sad and worried. (R. at 137.) Similarly, Miller noted that Smith's mood was anxious, depressed and pessimistic. (R. at 137.) No evidence or symptoms of bipolar disorder were observed. (R. at 137.) According to Miller, Smith's MINI Patient Health Survey acknowledged symptoms of major depressive disorder, as Smith indicated that he had been consistently depressed for approximately two years. (R. at 137.) In reviewing Smith's complaints and symptoms, Miller noted that Smith reported thoughts of suicide and death for the last four to five years, but no attempts had been made. (R. at 137.) Additionally, Miller recognized several symptoms of anxiety, including a racing heart, sweating, trembling, shaking and difficulty breathing. (R. at 137.)

According to the MMPI-2, Smith's profile indicated that he exaggerated his complaints. (R. at 138.) An M-FAST test also was administered in order to examine the patient's malingering. (R. at 138.) Smith scored beneath the cut-off score for malingering, which Miller said further substantiated the validity of the MMPI-2 results. (R. at 138.) Thus, Miller found that, although Smith's complaints were somewhat exaggerated, the clinical scales of the MMPI-2 were indicative of several problems consistent with other clinical evidence. (R. at 138.) Miller further explained that individuals within this range have a long-term predisposition to react to stress with physiological breakdown, and they are rigid and do not adapt well to

-24-

change. (R. at 138.) Among other things, people within this range exhibit sleep disturbance, low energy, depression, chronic anxiety and worry. (R. at 138.) Miller diagnosed Smith with moderate, major depressive disorder, generalized anxiety disorder and a pain disorder associated with both psychological factors and general medical conditions. (R. at 138.) Miller assessed Smith's Global Assessment of Functioning,[8] ("GAF"), score at 45. (R. at 138.)

Miller also completed a Medical Assessment of Ability to do Work-Related Activities (Mental ) form on May 31, 2006. (R. at 140-42.) Miller determined that Smith had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, function independently and maintain attention/concentration. (R. at 140.) Miller found that Smith possessed poor or no ability to deal with work stresses. (R. at 140.) Smith was found to have a good ability to understand, remember and carry out simple job instructions, a fair ability to understand remember and carry out detailed, but not complex, job instructions and a poor ability to understand, remember and carry out complex job instructions. (R. at 141.) In addition, Miller determined that Smith retained a fair ability to relate predictably in social situations and demonstrate reliability, a good ability to maintain personal appearance and a poor ability to behave in an emotionally stable manner. (R. at 141.) Miller opined that Smith was capable of managing his benefits in his own best interests. (R. at 142.) However, Miller

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 41-50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32.

concluded that, due to Smith's impairments, he would be required to miss work more than two days per month. (R. at 142.)

A consultative examination was conducted by Dr. William Humphries, M.D., on July 11, 2006. (R. at 143-50.) Upon examination, Smith was observed as alert, pleasant and in no distress. (R. at 144.) Smith's range of motion in the neck was slightly reduced and mild tenderness to palpation was noted at the base posteriorly with the cervical spine. (R. at 144.) Dr. Humphries also noted a reduced range of motion in the back with moderate dorsal kyphosis. (R. at 144.) No scoliosis or paravertebral muscle spasms were observed. (R. at 144.) There was mild tenderness to palpation of the superioir and medial aspects of the thoracic paraspinous musculature. (R. at 144.) No lumbar tenderness was noted. (R. at 144.) The joint range of motion of the upper extremities was full with no tenderness, heat, swelling or deformity; however, there was mild synovial thickening of some of the interphalangeal, ("IP"), joints of the fingers of each hand. (R. at 144.) The lower extremity joint range of motion was full in both hips, both knees and both ankles. (R. at 144.) There was some indication of mild synovial fullness of the knee joints with a slight decreased range of motion, but there was no heat or laxity. (R. at 144.) No erythema or active inflammation was noted. (R. at 144.) Dr. Humphries reported some mild synovial thickening of some of the metatarsophalangeal, ("MTP"), joints and IP joints of the toes of both feet. (R. at 144.) In addition, the left lower extremity revealed some small superficial spider veins and some small superficial varicosities. (R. at 144.) Moreover, some mild hemosiderin deposits in the lower extremities and a trace of pretibial edema was observed. (R. at 145.) The doralis pedis pulses and posterior tibials were 1+ to 2+ and equal. (R. at 145.)

-26-

Dr. Humphries reported that Smith moved on and off the examination table without difficulty, and he found Smith's grip, radial, median and ulnar nerve functions to be intact bilaterally. (R. at 145.) Smith performed the finger-to-nose test adequately, with no tremors or involuntary movements, and his Romberg test was negative. (R. at 144.) His fine manipulation was performed adequately bilaterally and his gait was within normal limits. (R. at 145.) Smith's heel and toe walk and tandem gait were also performed adequately. (R. at 145.) Dr. Humphries noted that Smith could bear weight on each leg and that his strength was within normal limits in all four extremities. (R. at 145.) No specific muscle wasting was recognized and his deep tendon reflexes were 1+ and equal in both upper extremities, and 2+ and equal in both knees and ankles. (R. at 145.) Dr. Humphries found no motor or sensory loss of extremities. (R. at 145.) While Smith's vision was found to be grossly normal, a mild hearing deficit was noted. (R. at 145.) A lung examination revealed some scattered rhonchi bilaterally, as well as scattered expiratory wheezes. (R. at 145.) A heart examination showed regular rhythm tachycardia, with no murmur, gallop or rub and a trace of pretibial edema. (R. at 145.)

Dr. Humphries diagnosed Smith with hypertension; mild to moderate chronic obstructive pulmonary disease ("COPD"); mild, probable degenerative joint disease in the cervical and thoracic spine; mild degenerative joint disease in both hands, knees and feet; mild to moderate venous insufficiency in both lower extremities; moderate rectus diastasis; and persistent tachycardia with an unknown etiology. (R. at 146.) Based upon these objective findings, Dr. Humphries determined that Smith possessed the ability to stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, lift items weighting up to

-27-

50 pounds occasionally and lift items weighing up to 25 pounds frequently. (R. at 146-48.) Dr. Humphries found that Smith was not limited in his ability to push and/or pull with his upper and lower extremities. (R. at 148.) In addition, it was determined that Smith could frequently balance, crouch, crawl and stoop, but could only occasionally climb and kneel. (R. at 148.) Dr. Humphries found that Smith was limited in his ability to reach in all directions, including overhead; however, no other manipulative limitations were noted. (R. at 149.) He concluded that Smith could only reach occasionally. (R. at 149.) According to Dr. Humphries, Smith was limited in his hearing ability, but no other visual/communicative limitations were revealed. (R. at 149.) As for environmental limitations, it was determined that Smith should have limited exposure to noise, dust, vibration, fumes, odors, chemicals and gases. (R. at 150.)

Edward E. Latham, Ph.D., evaluated Smith on June 22, 2006. (R. at 151-58.) Latham reported that Smith was an alert and adequately oriented individual who showed no evidence of pathological disturbance in his thought process. (R. at 152.) Latham noted that, at the time of the evaluation, Smith had just recently began mental health treatment. (R. at 152.) Smith denied any pervasive loss of interest or appetite disturbance. (R. at 152.) However, he did report feelings of guilt and uselessness, as well as concentration difficulty. (R. at 152.) Smith also admitted that he had experienced suicidal thoughts in the past, which he claimed occurred as recent as a week prior to his appointment with Latham. (R. at 152.) Smith alleged that he normally sleeps about four hours per night. (R. at 152.) Latham diagnosed Smith with an anxiety disorder, not otherwise specified, and ruled out bipolar disorder, not otherwise specified. (R. at 153.) Latham also completed a Medical Source Statement

-28-

of Ability to do Work-Related Activities (Mental) form. (R. at 156-58.) He determined that Smith's ability to understand, remember and carry out instructions was not affected by his impairments. (R. at 156.) Latham also found that Smith was not limited in his ability to interact appropriately with the public. (R. at 157.) Despite this finding, he did find that Smith had slight limitations in his ability to interact appropriately with supervisors and co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 157.) Latham noted that Smith's allegations of irritability supported the previously mentioned findings. (R. at 157.) In conclusion, Latham found that there were no other capabilities affected by the alleged impairments and that Smith was able to manage his benefits in his best interests. (R. at 157-58.)

Smith sought treatment from Dr. Ashvin Patel, M.D., from February 22, 2006, to October 2, 2006. (R. at 159-78.) Smith first saw Deborah Patterson, LCSW and LPC, at Dr. Patel's office, on February 22, 2006. (R. at 178.) Patterson described Smith as pleasant and cooperative. (R. at 178.) Smith informed Patterson that his attorney advised him to seek counseling. (R. at 178.) Smith complained of difficulty with concentrating and task completion, and explained that he was fatigued. (R. at 178.) Additionally, Smith complained of trouble sleeping and the inability to fall asleep when he was really tired. (R. at 178.) Patterson noted that Smith indicated that he had trouble coping with physical pain and limitations, as well as problems coping with his daughter's divorce. (R. at 178.) Smith further explained that he worried about his grandchildren because their father is an alcoholic and drug addict. (R. at 178.) He also reported feelings of uselessness and admitted to having suicidal thoughts. (R. at 178.) Specifically, Smith stated that he had thoughts of running his

-29-

vehicle off the interstate and thoughts of shooting his ex-son-in-law or himself. (R. at 178.)

Smith presented to Patterson again on March 3, 2006, where the treatment was focused on self-care and present functioning. (R. at 177.) At the time of this visit, Smith indicated that he planned to start exercising more regularly. (R. at 177.) Smith noted that he was hopeful that he could lose weight. (R. at 177.) Furthermore, Smith commented that his anxiety interferes with his daily functioning. (R. at 177.) Patterson provided Smith with literature that discussed ways to cope with anxiety. (R. at 177.) Patterson reported that Smith presented with an anxious mood and affect, but Smith stated that he was less anxious than he was at the initial office visit. (R. at 177.) Smith noted that Zoloft helped his anxiety. (R. at 177.) Patterson encouraged Smith to develop healthy cognitive patterns and beliefs about himself and the world in order to increase his self-esteem and reduce his anxiety and depression. (R. at 177.) Patterson reported that she worked with Smith on self-assessment, monitoring and coping skills, and that she worked to increase Smith's knowledge of healthy coping skills, such as relaxation skills, communication skills and thought-stopping. (R. at 177.) Patterson also allowed Smith to vent, providing him support and encouragement. (R. at 177.)

On February 17, 2006, Smith again sought treatment from Patterson. (R. at 176.) Patterson reported that Smith presented with anxiety and depression. (R. at 176.) She allowed Smith to vent and began work on developing healthy cognitive patterns and beliefs about himself and the world in order to increase his self-esteem and to reduce anxiety and depression. (R. at 176.) Patterson also reported that she

-30-

worked with Smith to replace his negative and self-defeating talk with verbalization of realistic and positive cognitive messages, and worked on establishing appropriate boundary settings with others. (R. at 176.) Patterson stressed the importance of Smith learning to take responsibility for his own feelings, attitudes and behaviors. (R. at 176.) Smith was instructed as to what causes depression and anxiety, and was told about the importance of learning to cope with the help of certain relaxation skills, communication skills and thought-stopping skills. (R. at 176.) Smith did not exhibit any suicidal/homicidal ideations. (R. at 176.)

Smith presented for treatment with Dr. Patel on April 4, 2006. (R. at 173-74.) Dr. Patel noted that Smith did not seem to be anxious, nervous or fearful during the visit, and explained that Smith reported that he had been "fairly stable and has not had any major panic or anxiety lately." (R. at 173.) Smith reported feelings of fatigue and lack of energy, which had manifested into mild to moderate amounts of depression. (R. at 173.) Dr. Patel noted that Smith had experienced periodic suicidal thoughts. (R. at 173.) No other psychosis was found. (R. at 173.) Dr. Patel diagnosed Smith with anxiety disorder, not otherwise specified, major depression, moderate, and sleep apnea. (R. at 174.) Dr. Patel recommended that Smith continue taking Zoloft due to a significant response in the past, and also recommended Risperdal 0.25 mg twice a day to reduce his anxiety and agitation. (R. at 174.)

Smith presented to Patterson on May 3, 2006. (R. at 172.) Smith demonstrated an irritable mood and congruent affect; however, he was able to use humor during the treatment session. (R. at 172.) The treatment focused upon many of the same aspects of the previous visits, with Smith reporting improvement in boundary setting with

-31-

others and improvement in communication and interpersonal functioning. (R. at 172.) No suicidal or homicidal ideations were elicited. (R. at 172.) Smith was instructed to continue with the current treatment plan. (R. at 172.) Smith again presented for treatment at Dr. Patel's office on May 15, 2006. (R. at 170.) His mood was described as irritable and his affect was improved, but still anxious. (R. at 170.) Smith denied any psychotic symptoms. (R. at 170.) Smith was prescribed trazadone and continued on Risperdal, while his Zoloft prescription was reduced from 200 mg per day to 150 mg per day. (R. at 170.) Smith continued to received treatment at Dr. Patel's office from May 25, 2006, to October 2, 2006, with consistent complaints of irritability, anxiety and depression. (R. at 159-69.) During this time period, Smith's complaints and symptoms remained virtually the same, as did his treatment plan. (R. at 159-69.)

Patterson completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form on October 4, 2006. (R. at 179-81.) Patterson found that Smith had a fair ability to follow work rules and with relate to co-workers, and a fair to poor ability to deal with the public, use judgment with the public, to interact with supervisors and to function independently. (R. at 179.) Patterson also found that Smith's ability to deal with work stresses and to maintain attention/concentration was poor. (R. at 179.) According to Patterson, Smith's ability to understand, remember and carry out complex job instructions and detailed job instructions was poor, and his ability to understand, remember and carry out simple job instructions was fair to poor. (R. at 179.) It was determined that Smith's ability to maintain personal appearance was good, while his ability to relate predictably in social situations was poor. (R. at 180.) His ability to behave in an emotionally stable manner was reported as fair to

-32-

poor. (R. at 180.) Patterson was unable to assess Smith's ability to demonstrate reliability and unable to identify any other work-related activities that may be affected by his impairments. (R. at 180.) Patterson found that Smith was capable of managing his benefits in his own best interests. (R. at 180.) Lastly, Patterson concluded that, based upon Smith's impairments, he would be forced to miss more than two days of work per month. (R. at 181.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658

-33-

F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 14, 2006, the ALJ denied Smith's claim. (R. at 8-19.) The ALJ found that Smith met the disability insured status requirements of the Act for disability purposes through December 31, 2008. (R. at 13.) The ALJ determined that Smith had not engaged in substantial gainful activity since the alleged onset date. (R. at 13.) The ALJ also found that Smith suffered from the following impairments, which, in combination, qualified as "severe," namely tachycardia, hypertension, venous insufficiency, chronic obstructive pulmonary disease, dorsal kyphosis and degenerative joint disease. (R. at 13.) The ALJ determined that Smith's complaints of sleep apnea syndrome were not severe, as there was no evidence presented that indicated that the condition results in more than minimal limitations in functioning. (R. at 13.) Likewise, the ALJ found that Smith's complaints of anxiety and depression were not severe as defined by the Social Security regulations. (R. at 14.) Although the ALJ did identify several impairments as severe limitations, he determined that Smith did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.)

The ALJ also found that Smith possessed the residual functional capacity to perform work with the following limitations: the ability to lift and carry items weighing up to 50 pounds occasionally and items weighing up to 25 pounds frequently; stand and/or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; frequently balance, crouch, crawl and stoop; occasionally climb and kneel; occasionally reach in all directions,

-34-

including overhead; limited exposure to noise, dust, vibration, fumes, odors, chemicals and gases; and no fine hearing ability. (R. at 15.) The ALJ found that occasional reaching equates to moderate limitations. (R. at 15.) Thus, the ALJ determined that Smith was unable to perform any of his past relevant work. (R. at 18.) The ALJ found that the transferability of job skills was not material to the determination of disability. (R. at 18.) Based upon Smith's age, education, work experience and residual functional capacity, the ALJ concluded that Smith could perform jobs existing in significant numbers in the national economy, including those of a hand packager, a sorter, an assembler, an inspector, a cleaner and as a food service-related employee. (R. at 19.) Therefore, the ALJ found that Smith was not under a "disability" as defined under the Act and, thus, was not entitled to benefits. (R. at 19.) *See* 20 C.F.R. § 404.1520(g).

Smith argues that the decision of the ALJ was not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, (Docket Item No. 11), ("Plaintiff's Brief"), at 5-7.) In particular, Smith argues that the ALJ improperly altered findings made by an examining physician and relied upon those altered findings in rendering his decision. (Plaintiff's Brief at 5-7.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed

-35-

all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Smith argues that substantial evidence does not support the ALJ's decision because the ALJ erred by altering the findings of Dr. William Humphries, M.D., an examining physician. (Plaintiff's Brief at 5.) According to Smith, in rendering his decision, the ALJ adopted the findings of the consultative examination and assessment performed by Dr. Humphries. (Plaintiff's Brief at 5.) Among other things, Dr. Humphries determined that Smith had the ability to occasionally reach in all directions, including overhead. (R. at 149.) In the ALJ's findings, he stated, "[f]or purposes of vocational expert questioning, the undersigned finds that occasional reaching equates to moderate limitations." (R. at 15.) Notably, Smith points out that,

-36-

according to the form completed by Dr. Humphries, "occasionally" is defined as "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)." (R. at 147-50.)

At the hearing, the vocational expert asked the ALJ for clarification as to the individual's ability to the reach with his arms. (R. at 197.) The ALJ identified the individual's limitation to reach in all directions as moderate; thus, based upon a moderate limitation, the vocational expert identified numerous jobs existing in significant numbers within the regional and national economies. (R. at 197.) When Smith's counsel examined the vocational expert, he specifically asked her to consider the abilities of the individual if the term "occasionally" meant up to one third of a typical eight-hour workday and not on a continuous basis, as defined in Dr. Humphries' evaluation form. (R. at 200.) The vocational expert opined that, under that definition of occasionally, no jobs would be available because she would consider the restrictions to be greater than moderate. (R. at 200.) Smith contends that the ALJ failed to explain his reasoning for altering the findings that he otherwise accepted in full. (Plaintiff's Brief at 6-7.) As such, Smith argues that there is no evidence in the record to support the ALJ's findings. (Plaintiff's Brief at 7.)

Based upon a review of the record, I agree. I am of the opinion that the court must examine the hypothetical that was posed to the vocational expert, as well as the findings the ALJ made regarding Smith's residual functional capacity in order to determine whether or not the ALJ acted properly. Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response

-37-

to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989.) The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity was supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ. The Commissioner may not rely upon the answer to a hypothetical question if hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

In this case, the ALJ specifically found that "[a]fter careful consideration of the entire record, the undersigned finds that [Smith] has the residual functional capacity to perform work with the limitations assessed by Dr. Humphries in Exhibit 7F." (R. at 15.) Therefore, by essentially adopting the findings of Dr. Humphries, the court makes the logical conclusion that the ALJ also adopted the definitions as set forth in the relevant form completed by Dr. Humphries.[9] Despite these findings, when posing the hypothetical to the vocational expert, the ALJ altered the meaning of "occasionally" to mean moderate limitations, as opposed to the definition as stated on Dr. Humphries' evaluation form. (R. at 15, 197.) Thus, by answering the hypothetical as posed by the ALJ, and then answering a hypothetical posed by Smith's counsel, which was in total conformance with Dr. Humphries' findings, the vocational expert provided two conflicting opinions. Obviously, the phrasing of the

---

[9] The court recognizes that, not only did the ALJ apparently adopt the findings found in Exhibit 7F, but he also found that occasional reaching equates to moderate limitations. However, that finding is in direct conflict with Dr. Humphries' findings in Exhibit 7F. Therefore, the court finds that the ALJ, in posing the hypothetical, improperly altered findings that he had supposedly adopted.

-38-

question was critical in the vocational expert's analysis and opinions.

The ALJ found that Smith retained the residual functional capacity to perform work with the limitations assessed by Dr. Humphries. (R. at 15.) However, when posing his hypothetical to the vocational expert, the ALJ failed to adequately set forth the residual functional capacity in conformity with his findings. He altered the findings of Dr. Humphries, which, in turn, caused the vocational expert to identify jobs existing in significant numbers where she otherwise would not have done so. Based upon this error by the ALJ, this court finds that substantial evidence does not support the ALJ's finding as to the claimant's residual functional capacity, and that the ALJ unequivocally failed to properly set forth the residual functional capacity to fit his findings. Moreover, it is impermissible for the Commissioner to rely upon an answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim*, 599 F.2d at 1312. In this case, because the ALJ chose to adopt the findings set forth in Exhibit 7F, and then altered those findings in questioning the vocational expert, he failed to pose a hypothetical that mirrored his findings. Therefore, for the reasons stated above, I will remand this case for further consideration.

## *IV. Conclusion*

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Smith's residual functional capacity and ability to work.

-39-

An appropriate order will be entered.

**DATED:**     This _30th_ day of January, 2008.

_[signature]_

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 1:07-cv-00045-GMW-PMS   Document 16   Filed 01/30/08   Page 40 of 40   Pageid#: 295